IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Ghim Li Global Pte Ltd., | : | Case No. 1-07-cv-170 |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART |
| | : | AND DENYING IN PART CROSS |
| MCCC Sportswear, Inc., | : | MOTIONS FOR SUMMARY |
| | : | JUDGMENT AND DENYING |
| Defendant/Counterclaim Plaintiff. | : | MOTION TO STRIKE |
| | : | |

This matter is before the Court on the parties' cross motions for summary judgment and Plaintiff's motion to strike the deposition testimony and report of Jay Levitt.  The Court heard oral argument from the parties on their motions on August 13, 2008.  For the following reasons, Plaintiff Ghim Li Global Pte Ltd.'s motion for summary judgment (doc. 47) is **DENIED**; Counter Claimant MCCC Sportswear, Inc.'s motion for summary judgment (doc. 48) is **GRANTED IN PART** and **DENIED IN PART**; and Plaintiff's motion to strike (doc. 61) is **DENIED**.  Counts II and III of Ghim Li's Complaint are **DISMISSED AS MOOT**.

I.     BACKGROUND

This is a breach of contract action stemming from contracts between MCCC Sportswear, Inc. ("MCCC"), an Ohio corporation, and Ghim Li Global Pte Ltd. ("Ghim Li"), a Singapore company.  MCCC designs and distributes women's and men's appliquéd and embroidered garments to departments stores and general merchandise stores nationwide.  To fulfill its orders, MCCC produces garments in-house and through domestic and foreign subcontractors.  Subcontractors like Ghim Li produce MCCC-designed products to MCCC's specifications.

1

In early 2006, MCCC submitted a series of twenty-eight purchase orders ("Purchase Orders") to Ghim Li requesting that Ghim Li agree to manufacture various garments and accessories (the "Goods") in accordance with the terms of the Purchase Orders in conjunction with MCCC's Fall 2006 apparel program (the "Program"). Each Purchase Order was for a different portion of the total Goods requested, and with the exception of item, price, and quantity, each Purchase Order's terms were identical.

Each Purchase Order was FOB point of origin, which for Ghim Li was either Malaysia or Sri Lanka, and contained a "Close Ship Date" by which Ghim Li was required to ship the Goods from the designated point of origin. Certain terms and conditions were listed on the Purchase Orders, including the following delivery terms:

> **DELIVERY DATE:** The "Close Ship Date" on the purchase order represents the last port of export ship date. The "Open Ship Date" on the purchase order represents the earliest ship date the vendor can ship the product.
>
> Seller accepts FOB port of origin and export close ship date with purchase order acceptance and agrees that if this date cannot be met MC Sportswear is to be notified in writing and that item(s) will be expedited at sellers expense to arrive at agreed upon arrival date.
>
> Seller agrees to communicate with MCcc [sic] Sportswear on a continual basis on production status to insure that FOB close ship date and arrival date is met.

(Purchase Orders ¶ 2, docs. 7-2 through 7-6.) Additionally, each Purchase Order specified that changes to purchase orders would be in writing:

> **CHANGES TO PURCHASE ORDER:** MCcc [sic] Sportswear will communicate in writing on any change requests (delivery date, design, packaging, delivery instructions etc.) and any such changes will be negotiated with supplier and purchase order amended accordingly.

(*Id.*) Ghim Li accepted the Purchase Orders without modification.

In conjunction with the Purchase Orders, Ghim Li also agreed to a Purchase Order Agreement that specified the penalties for certain contractual violations. The penalties relevant to this action are as follows:

> Late Shipment (Product shipped after close date on purchase order w/o written approval): Mc's [sic] cost of goods plus cost for freight.
>
> Delayed shipment (Due to inaccurate reporting on any required customs entry document . . .): Payment for all detention fee's [sic], overtime wages & any penalty assessed to us by our customer for poor shipping performance.
>
> Failure to ship (Non shipment for any accepted PO): any additional cost associated with domestic manufacturing & any penalties assessed by our retailer.
>
> Under Shipment (Received less product, by sku, than on purchase order): > 1% ship shortage by SKU must be air shipped at vendor's expense, if unable to ship the penalty is equal to the cost of domestic production & any penalty incurred from the retailer.

(Doc. 7-7.) MCCC agreed to pay Ghim Li for the Goods through an irrevocable documentary letter of credit issued by Fifth Third Bank, Cincinnati, Ohio.

After entering into Purchase Order agreements with MCCC, Ghim Li began experiencing difficulties with the mills that manufactured fabric for the Goods. In April 2006, Ghim Li made the first of several email requests that MCCC grant it extensions on delivery deadlines. (Tay Dep. Ex 17.)[1]  In May 2008, Eric Lu, General Manager of MCCC China, extended certain

---

[1] Excerpts of the deposition of Peter Tay, Ghim Li's former Chief Operating Officer, are attached as Exhibit 7 to doc. 48.

delivery dates but noted that Ghim Li should not expect additional extensions, stating in an email:

> Tom confirmed below delivery extension.  PLS UNDERSTAND THAT THIS IS AN EXCEPTIONAL CASE BECAUSE THIS IS YOUR FIRST TIME DOING BUSINESS WITH MC.  DON'T EXPECT ANY EXTENSION ON THE SUBSEQUENT DELIVERIES!!!!  Pls confirm [u]nderstanding by return.
>
> I need you to confirm back that if goods are not on a boat by the extended date specified below, EVEN ONE DAY LATE, you will have to air ship at your cost.

(Tay Dep. Ex. 18.)  In response, Wallace Wu, the sales manager responsible for overseeing the Program for Ghim Li, confirmed that Ghim Li would be responsible for the expense of shipping the Goods by air in the event there was any further delay.  (*Id.*)  Such an accommodation by Ghim Li was, in fact, the remedy prescribed by the Purchase Orders:  "Seller accepts . . . export close ship date with purchase order acceptance *and agrees that if this date cannot be met* MC Sportswear is to be notified in writing and that *item(s) will be expedited at sellers expense* to arrive at agreed upon arrival date."  (Purchase Orders ¶ 2, docs. 7-2 through 7-6 (emphasis added).)

In June 2006, after making additional requests to extend delivery deadlines, Ghim Li requested that MCCC cancel some of the orders.  (Tay Dep. 177, 180).  MCCC would not agree to cancel the orders because it had commitments to provide the garments to several retailers.  Sue Kollstedt, MCCC's Vice President of Production, traveled to Singapore where, on July 1, 2006, she met with Peter Tay and Wallace Wu to work toward resolving production issues.

(Kollstedt Dep. at 8.)[2] At that face-to-face meeting, the parties discussed extending delivery deadlines and waiving certain terms of the letter of credit, but they did not discuss modifying the terms of the Purchase Orders. (Tay Dep. 185-86.) Following that meeting, Marta Callahan, President of MCCC, wrote a letter to Mr. Tay which read as follows:

> This letter is to document our discussion from July 1, 2006.
> MCCC Sportswear, Inc. is in agreement to waive discrepancies for purpose of drawl [sic] on Ghim Li's Letter of Credit for the following reasons:
> • Partial shipments
> • Inaccurate port of loading (Sri Lanka)
> • Air shipments –vs.–40 foot containers
> • Non issuance of case log document for all air shipments & PO 10000231
> • Solid wood material document
>
> I hope this resolves any apprehension you have with our Company. Waiving discrepancies has become a normal occurrence when dealing with Letters of Credit. With time, I hope we will develop a level of trust that makes these letters no longer necessary.

(Leong Decl. Ex. A.)[3] Because of this letter, Ghim Li "believed that MCCC would waive any discrepancies and approve the payment of all invoices." (Leong Decl. ¶ 3.)

Ghim Li continued to make shipments after the original close ship dates and, in some instances, after the extended dates. (Kollstedt Dep. Ex. 1.) Ghim Li understood that it was responsible for shipping via air at its expense anything that was late. (Tay Dep. 128.) However, upon discovering the costs associated with air shipping, Ghim Li asked for additional extensions on shipping deadlines so that it could ship via sea and not air. (Tay Dep. Ex. 23.) Then, in mid-

---

[2] Excerpts of the deposition transcript of Susan P. Kollstedt are attached as Exhibit D to document 47.

[3] The Declaration of Eu Mun Leong, Ghim Li's Chief Financial Officer, is attached as Exhibit F to Ghim Li's motion, doc. 47-7.

September 2006, Ghim Li told MCCC that it was no longer "in any position" to air ship the remaining MCCC orders.  (Tay Dep. 224-25, Dep Ex. 25.)  MCCC's Sue Kollstedt responded: "We have extended our dates for shipment as far out as possible either by sea or by air & our customer will not extend our orders! so [sic] it is imperative that Ghim Li does whatever is needed to assure on time delivery to MC on all PO's [sic]."  (Tay Dep. Ex. 26.)  Further, in an email dated October 5, 2006, MCCC reminded Ghim Li of its obligations under the Purchase Orders:

> Again you accepted our orders with the original delivery dates, & you accepted [o]ur PO agreement which states you will pay for freight on late shipments & pay any additional costs for product that must be produced domestically plus penalties assessed by our customers for poor shipping performance.

(Tay Dep. Ex. 31.)  Ghim Li did not dispute this characterization by MCCC either orally or in writing.  (Tay Dep. 259-60.)  However, it did not pay to air ship a portion of the remaining Goods to the United States.  In order to obtain shipment of the last 200,000 garments, MCCC paid for air shipment of the goods at its own expense.  (Callahan Dep. 33-34.)[4]

MCCC admittedly "made concessions and allowed for late shipments."  (Kollstedt Dep. 26.)  MCCC accepted delivery on all the goods shipped, which MCCC received on sixty different dates from July through November 2006.  (Callahan Dep. 32-34; Cumberledge Dep. Ex. 1.)[5]  MCCC never told Ghim Li that it was not going to pay for the goods that were shipped late.  (Kollstedt Dep. 27-28.)  However, MCCC did not revise the Purchase Orders to change the

---

[4] Excerpts of the deposition transcript of Marta D. Callahan are attached as Exhibit C to doc. 47, Ghim Li's motion for summary judgment.

[5] Excerpts of the deposition transcript of Marcia A. Cumberledge are attached as Exhibit I to doc. 47.

dates that were originally agreed to. (*Id.*; doc. 7-7.) Furthermore, MCCC representatives repeatedly indicated in emails to Ghim Li that the shipping delays were unacceptable or were causing a hardship to MCCC. (Tay Dep. Ex. 15, 18, 19, 23, 26, 31.) Additionally, MCCC claims that Ghim Li admitted liability for breach in a letter dated November 6, 2006. The letter, which Peter Tay wrote to Ms. Kollstedt and Mr. Lu, provided in part:

> It has been an eventful first programme, and we know much inconvenience has been created, resulting from the selection of fabric mill used and your thoughtful help in allowing much delivery extension via sea, ultimately air freight balance of POs at your account, are indeed commendable, and we thank you very much, from the bottom of our heart.
>
> And we also sincerely apologise for the massive inconvenience which we have created for your esteemed company, due to the late deliveries, even via air freight, and the unnecessary uncertainty on shipment mode, dates etc.

(Tay Dep. Ex. 32.)

The last shipment date was November 15, 2006. (Cumberledge Dep. Ex. 1.) There is a dispute as to when payment was due under the Purchase Orders: Ghim Li contends that MCCC was required to make payment within sixty days after the bill of lading was issued; MCCC claims that there was only a date (sixty days after the bill of lading issued) after which Ghim Li could make a draw on the letter of credit. (Callahan Counter Decl. ¶ 13.)[6] Under Ghim Li's argument, payment was due on January 15, 2007. On or about that date, Ghim Li was left with seventy-four unpaid invoices. (Leong Decl. Ex. B.) Apparently by that time, the letter of credit had expired. Ghim Li claims it did not know that MCCC was refusing payment on the

---

[6] The Counter Declaration of Marta D. Callahan is filed as doc. 59.

remaining invoices until it received a letter on January 29, 2007 from an attorney representing MCCC. (Leong Decl. ¶ 5, referring to doc. 7 Ex. C.)

MCCC and Ghim Li stipulate that the total amount of the contract between them was $2,438,930. MCCC paid Ghim Li $807,832.58 on the contract but withheld the balance. Ghim Li seeks from MCCC the remainder due on the contract, $1,631,097.42. MCCC denies any obligation to pay the balance of the contract amount and further claims an entitlement to liquidated damages in the amount of $1,136,106.83 (comprised of $276,027.15 in air freight charges; $32,803.58 in domestic production charges; $4684.10 in domestic freight charges; $14,758.42 in Worldwide Express charges; and reimbursement of the $807,832.58 it already paid Ghim Li on the contract). (Callahan Dep. 83, 86, Ex. 25.) In the alternative, MCCC claims an entitlement to consequential damages in the amount of $423,955 (comprised of $1,961,516.25 in consequential damages minus the $1,537,560.97 withheld by MCCC). The consequential damages include the amount that retailers J.C. Penny and Kohl's "charged back"[7] MCCC and that allegedly were directly attributable to Ghim Li's late deliveries.

---

[7] MCCC explains the concept of "chargebacks" in its opposition memorandum. (Doc. 7.) Under the terms of MCCC's contracts with the retailers, MCCC is generally required to guaranty that a product line will, as a whole, sell for approximately fifty-five percent of the full retail price. MCCC is liable to the retailer for the guaranteed amount of the Goods if the product line under-performs. The guaranty amount is typically over three times the amount MCCC paid for the Goods.
According to MCCC, because of Ghim Li's late deliveries, the Goods' "floor time" was significantly reduced, and the retailers were unable to sell the Goods to consumers during the short holiday shopping season. Therefore, the retailers "charged back" MCCC approximately $1,596,200, of which $1,333,243 were directly attributable to Ghim Li's late deliveries. (Callahan Dep. Ex. 9.)

**II.     SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. An issue of fact is "genuine" if a reasonable person could return a verdict for the non-moving party. *Jacob v. Township of West Bloomfield*, 531 F.3d 385, 389 (6th Cir. 2008) (citing *Liberty Lobby,* 477 U.S. at 248).

In this case, both parties have moved for summary judgment on their own claims as well as on the counterclaims against them. "When the moving party bears the burden of persuasion at trial, the movant must satisfy this burden by pointing to evidence in the record that supports the movant's version of all material facts and demonstrates the absence of any genuine issue of

material fact." *DeWitt v. Penn-Del Directory Corp.*, 872 F. Supp. 126, 137 (D. Del. 1994) (*citing National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir.1992)). "If the moving party does not meet this standard, the Court must deny the motion for summary judgment, even if the non-moving party does not present opposing evidentiary materials. In other words, the moving party with the burden of persuasion at trial must show that it would be entitled to a judgment as a matter of law." *Id*.

### III. ANALYSIS

#### A. Breach of Contract

The parties agree that the dispute between them is governed by the Ohio version of Article Two of the Uniform Commercial Code, codified at Ohio Rev. Code § 1302.01 *et seq*. MCCC seeks summary judgment on its claim that Ghim Li breached the contract between them. Ordinarily, judges interpret the language of contracts as a matter of law. *Royal Ins. Co. of America v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008). "If a contract is clear and unambiguous . . . there is no issue of fact to be determined." *Id*. (quoting *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000)). On the other hand, if a contract contains ambiguities, it becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties. *Id*.

All the Purchase Orders included a close ship date by which Ghim Li was to ship the Goods and an arrival date for the Goods to arrive at MCCC's warehouse in Loveland, Ohio, if the close ship date was not met. The Purchase Orders specified that changes to the Purchase Order would be in writing, specifically, "MCcc Sportswear will communicate in writing on any change requests . . . and any such changes will be negotiated with supplier and purchase order amended accordingly."

Ghim Li does not deny breaching at least some terms of the contracts with MCCC: it admits that the deliveries were outside the original deadlines set forth on the Purchase Orders, and it acknowledges responsibility for $276,027.15 for air freight charges, $32,803.58 for domestic production, $4684.10 for domestic freight charges, and $14,758.42 for Worldwide Express charges.  Rather than dispute liability for breach, Ghim Li argues that MCCC is not entitled to the damages it seeks because MCCC consented to the late deliveries, accepted the Goods, and did not give Ghim Li timely notice of its intent to pursue damages for breach.

The Court finds, as a matter of law, that there is no ambiguity with respect to the terms of the Purchase Orders.[8]  The Purchase Orders expressly provide that change requests had to be memorialized in an amended purchase order.  The parties never amended a purchase order for the purpose of changing shipment deadlines.  Emails and other documents between Ghim Li and MCCC representatives that purported to alter deadlines are not a substitute for an amended purchase order.  *See*, *e.g.*, *Reliance Ins. Co. v. Keybank U.S.A., N.A.*, No. 1:01-cv-62, 2006 WL 2850454 at *7 (N.D. Ohio Sept. 29, 2006).

The Court therefore agrees with MCCC's position that, because Ghim Li did not meet the shipping deadlines specified in the Purchase Orders and did not negotiate an amended purchase order, it breached the contracts.  However, Ghim Li has raised a genuine issue of material fact as to whether MCCC is entitled to either the liquidated damages set forth in the Purchase Order Agreement or, alternatively, consequential damages under the UCC–an issue discussed fully

---

[8]  The Court expressly distinguishes the Purchase Order from the Purchase Order Agreement, which is attached to the Purchase Orders.  In contrast to the plain language of the Purchase Order, the Purchase Order Agreement is ambiguous.  Specifically, the error description for "late shipment" provides for liquidated damages when the product is shipped late "w/o written approval."  It is unclear whether "written approval" in this context refers to an amended purchase order or any form of writing, such as an email.

below. Accordingly, MCCC's motion is GRANTED as to liability for breach of contract on all Purchase Orders for which delivery requirements were not met but DENIED as to damages. *See*, *e.g.*, *Miles Distributors, Inc. v. Specialty Const. Brands, Inc.*, 417 F. Supp. 2d 1030, 1039 (N.D. Ind. 2006).

**B.     Action for Price**

Notwithstanding Ghim Li's acknowledgment that it did not strictly comply with the Purchase Orders, Ghim Li seeks payment from MCCC because MCCC accepted the Goods that Ghim Li delivered. Under Ohio Rev. Code § 1302.83, "[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price: (1) of goods accepted. . . ." MCCC admits that it accepted all the Goods produced by Ghim Li, notwithstanding the fact that delivery of those Goods was late.[9] Indeed, MCCC sold the Goods to retailers; thus defying any argument that it rejected the Goods as the term is defined by the UCC.[10] Despite having accepted the Goods, MCCC paid Ghim Li only $807,837 of the amount due under the Purchase Orders. MCCC argues that it was entitled to withhold payment for the remainder of the Goods it accepted as a remedy for Ghim Li's breach of the contract.

The Ohio Revised Code permits a buyer to deduct damages resulting from any breach of the contract from any part of the price still due under the same contract. Ohio Rev. Code § 1302.91. However, the right to any such deduction depends upon the buyer notifying the seller

---

[9] Notably, Ghim Li under-produced garments on some of the Purchase Orders, requiring MCCC to produce certain goods domestically. Ghim Li does not dispute this and concedes its obligation to pay MCCC $32,803.58 in damages because of under shipment.

[10] "Manner and effect of rightful rejection. (A) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller. (B)(1) after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." Ohio Rev. Code § 1302.61.

of his intention to do so. *Id.*; *see also* Ohio Rev. Code § 1302.65 (explaining that a buyer who has accepted goods is entitled to a remedy for breach *if*, within a reasonable time after he discovers the breach, he notifies the seller of the breach); Ohio Rev. Code § 1302.88, Official Comment 1 ("The buyer's failure to notify of his claim under the section on effects of acceptance [§ 1302.65] . . . operates to bar his remedies under either [§ 1302.91] or the present section [concerning buyer's damages for breach in regard to accepted goods].")

There is no dispute that MCCC accepted but did not pay for all the Goods. However, there is a dispute over whether MCCC gave timely notice of a breach such that it is entitled to a deduction from the contract price. In particular, MCCC states that it responded to Ghim Li's requests for delays with "written or verbal notice to Ghim Li of its failure to comply with the purchase orders." (Callahan Counter Decl. ¶ 9). Ghim Li, on the other hand, states that MCCC never gave it notice of any breach or said that it did not intend to pay certain invoices. (Tay Dep. 310-17.) Because the timeliness and adequacy of MCCC's alleged notice of breach is a material fact, and because neither party has demonstrated that reasonable minds could come to but one conclusion on the issue, neither party is entitled to summary judgment on Count I of Ghim Li's complaint.

Counts II and III of the Complaint were pleaded in the alternative to Count I. Because an action for price is the correct mechanism for resolving this contract dispute between the parties, and because Ghim Li's counsel has conceded the mootness of Counts II and III (T.P. Aug. 13, 2008, doc. 73, at 4), the Court dismisses Counts II and III of the Complaint as moot.

**C.  Damages**

Having established that Ghim Li did not strictly comply with the terms of the Purchase Orders but that MCCC nonetheless accepted the Goods delivered, the first step to resolving

MCCC's entitlement to damages is whether MCCC timely notified Ghim Li of breach.  If it did not, then MCCC is barred from any remedy:

> (C) Where tender has been accepted: (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . . .
> (D) The burden is on the buyer to establish any breach with respect to the goods accepted.

Ohio Rev. Code § 1302.65.

The Sixth Circuit has explained that the notice provision of the Code serves two policies:

> First, express notice opens the way for settlement through negotiation between all parties.  Second, proper notice minimizes the possibility of prejudice to the seller by giving him "ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties."

*Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 152 (6th Cir. 1983) (quoting *Standard Alliance Industries v. Black Clawson*, 587 F.2d 813, 826 (6th Cir. 1978)).  "These same purposes are served by requiring notice of breach in instances where the goods are conforming, but the performance is late." *Id*.

Under Ohio law, "the 'determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact.'" *Chemtrol Adhesives, Inc. v. American Mfgs Mutual Ins. Co.*, 42 Ohio St. 3d 40, 51, 537 N.E.2d 624 (1989) (quoting *Kabco Equip. Specialists v. Budgetel, Inc.*, 2 Ohio App. 3d 58, 61, 440 N.E.2d 611 (Ohio App. 1981)).  "[N]otice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of the contract." *Chemtrol Adhesives*, 42 Ohio St.3d at 54, 537 N.E.2d at 638.  Furthermore, there is no requirement that notice be in writing. *Id.*  The parties here agree that MCCC's letter to

14

Ghim Li dated January 27, 2007 constituted legally sufficient notice of breach.  Additionally, MCCC contends that it gave Ghim Li notice of breach at least six times prior to that date, citing emails dating as early as May 12, 2006.  (*See* Tay Dep. Exs. 18, 19, 29, 26, 31, and 33.)

However, the parties have failed to present sufficient evidence for the Court to conclude whether the January 27, 2007 notice or any other of MCCC's alleged notices of breach were "within a reasonable time" and, if so, as to which Purchase Orders and which Goods.  Keeping in mind the policy behind the notice requirement, timely notice is that which will allow the seller "ample opportunity to cure the defect . . . or do whatever may be necessary to properly defend himself or minimize his damages."  *Roth Steel*, 705 F.2d at 152 (remanding the matter to the trial court for a determination of whether that notice–which was five months after the buyer knew of the late delivery–was timely).

MCCC argues that the notice of breach it gave Ghim Li was within a reasonable time because Ghim Li had ample opportunity throughout the Program to make adjustments, cure any breaches, and prepare for litigation.  However, it appears from the evidence of record that practical realities of the industry may have foreclosed Ghim Li's ability to "cure" a breach consisting of missing a close ship date at the time MCCC gave notice.  In short, whether the email and oral communications from MCCC to Ghim Li stating that the shipping delays were "unacceptable" were sufficient to constitute timely notice of breach under the UCC is a matter to be resolved by a jury.

If MCCC did give Ghim Li notice of a breach within a reasonable time, the issue then becomes whether it is entitled to liquidated damages as specified in the Purchase Orders or consequential damages.  The Court has previously determined that the liquidated damages provision of the Purchase Orders, described in the Purchase Order Agreement, is valid and

enforceable in this action. (Doc. 34.) However, the Purchase Order Agreement is ambiguous and its application to the case herein is uncertain. Specifically, the error description for "late shipment" provides for liquidated damages when the product is shipped late "w/o written approval." It is unclear whether "written approval" in this context refers to an amended purchase order or any form of writing, such as an email. The jury must make this determination in order to resolve MCCC's entitlement to liquidated damages.

The Court also cannot determine whether the liquidated damages provision was intended by the parties to be the exclusive remedy for a breach. Under Ohio law, a buyer may recover damages "in any manner which is reasonable." Ohio Rev. Code § 1302.88. The Purchase Order Agreement does not specify that the liquidated damages listed therein are to be the exclusive remedies for a breach of the Purchase Order. The seemingly exhaustive nature of the list of potential violations included in the Purchase Order Agreement implies that the parties may, in fact, have intended the damages specified therein to be exclusive. However, neither party presented any evidence on this issue.

A reasonable person might conclude that Ghim Li and MCCC did not intend for liquidated damages to be the exclusive remedy for breach of the Purchase Orders. *See*, *e.g.*, *22810 Lakeshore Corp. v. Xam, Inc.*, No. 79091, 2002 WL 22096 (Ohio App. Jan. 3, 2002) (holding that liquidated damages clause did not limit seller's damages for breach where, *inter alia*, the clause did not state that liquidated damages were the exclusive damages allowed for breach). In this case, if the penalty for "late shipment" applies only in the event Ghim Li did not get written approval, and if the emails agreeing to extend the deadlines constitute written approval, then MCCC is barred from any remedy whatsoever for Ghim Li's failure to comply with the original shipping deadlines. This may, in fact, be what a fact-finder concludes was the

parties' intent. However, such a conclusion is far from certain.

Finally, Ghim Li has raised an argument that waiver by estoppel precludes MCCC from recovering either liquidated or compensatory damages. Waiver by estoppel prohibits a party from engaging in acts and conduct inconsistent with an intent to claim a right, so as to mislead the other party to their prejudice. Under such circumstances, the party having the right is estopped from insisting upon it. *See*, *e.g.*, *Nat'l City Bank v. Rini*, 162 Ohio App.3d 662, 834 N.E.2d 836 (Ohio App. 2005). Whether MCCC's acts were inconsistent with its intent to exercise any rights it had to damages is a jury matter. For these reasons, the Court cannot grant Ghim Li's motion seeking a judgment that MCCC's only potential measure of damages is contractual, and it cannot grant MCCC's motion seeking a judgment for specific damages.

        **D.**        **Motion to Strike**

The expert report and opinion of Jay Levitt provided to the Court in support of MCCC's motion for summary judgment is supported by the Federal Rules of Evidence and thus is permissible material for this Court's consideration. However, the Court refrains from deciding at this juncture the extent to which Mr. Levitt's testimony concerning consequential damages will be admissible at trial, such matters potentially being moot pending the jury's determination as to the exclusivity of liquidated damages.

**III.**        **CONCLUSION**

For the foregoing reasons, Ghim Li's motion for summary judgment (doc. 47) is DENIED. MCCC's motion for summary judgment (doc. 48) is GRANTED on Ghim Li's liability for breach of contract but is otherwise DENIED. The motion to strike Jay Levitt's deposition testimony and report is DENIED. Counts II and III of Ghim Li's Complaint (doc.1) are DISMISSED AS MOOT.

The following facts are clearly established: that Ghim Li breached the Purchase Orders when it failed to meet the delivery requirements specified therein, and that MCCC nonetheless accepted the Goods delivered.  Therefore, Ghim Li is entitled to the price on the contract subject to a finding that MCCC is entitled to damages.  As to damages, it is clearly established that MCCC's letter of January 27, 2007 constitutes notice of breach under Ohio Rev. Code § 1302.65(C).  However, it is for a jury to determine whether the January 27, 2007 notice was timely as to any Purchase Orders, and whether MCCC gave timely notice of breach to Ghim Li prior to January 27, 2007 as to any of the Purchase Orders.  If the fact-finder concludes that MCCC did not give timely notice of breach as to any of the Purchase Orders, MCCC is not entitled to damages.

To the extent the fact-finder concludes that MCCC timely gave notice of breach as to any of the Purchase Orders, a genuine issue of fact remains as to whether MCCC is entitled to the liquidated damages prescribed in the Purchase Order Agreement or to consequential damages. MCCC is entitled to liquidated damages, subject to a jury determination that MCCC is estopped from enforcing this right, if the fact-finder determines that the term "written approval" in the Purchase Order Agreement means an amended purchase order.  If the fact-finder determines that the term "written approval" means any form of writing, MCCC is not entitled to liquidated damages as to any Goods delivered within an extended delivery deadline communicated in any form of writing.

Finally, to the extent liquidated damages are not available to MCCC, the fact-finder must ascertain whether the parties intended liquidated damages as specified in the Purchase Order Agreement to be the exclusive remedy available for a contractual breach.  If the fact-finder determines that the parties intended the liquidated damages to be MCCC's exclusive remedy,

18

MCCC is not entitled to consequential damages.  If the fact-finder determines that the parties did not intend the liquidated damages to be exclusive, and if MCCC has not waived its right to consequential damages, then MCCC is entitled to consequential damages that it can prove were caused by a breach by Ghim Li that was not listed as a violation in the Purchase Order Agreement specifying liquidated damages.

    IT IS SO ORDERED.

                                                                                       s/Susan J. Dlott
                                                                                     Susan J. Dlott
                                                                                     United States District Judge